# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ROBERT CARLSON,

     *Plaintiff*,

*v.*                     CASE NO. 14-10900

CAROLYN W. COLVIN       DISTRICT JUDGE GEORGE CARAM STEEH
Commissioner of Social Security,    MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for Supplemental Security Income ("SSI")

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

under Title XVI, 42 U.S.C. §§ 1381-1385, and for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401-34. The matter is currently before the Court on cross-motions for summary judgment. (Docs. 15, 18.)

Plaintiff Jeremy Robert Carlson was forty-seven years old on his alleged onset date, December 31, 2003, and fifty-seven years old when the Commissioner rejected his claim. (Transcript, Doc. 7 at 24, 163, 169.) He graduated high school, (Tr. at 33, 206), and has worked as a home health aide, laundry worker, machine operator, and bench assembler. (Tr. at 51, 186-95, 252.) At the initial administrative stage, the Commissioner considered affective disorders and substance addiction, denying Plaintiff's claims on February 7, 2013. (Tr. at 55-56.) Plaintiff asked for a hearing in front of an Administrative Law Judge ("ALJ"), who would consider the application de novo. (Tr. at 135-44.)

ALJ Mary Ann Poulose convened the hearing on September 4, 2013. (Tr. at 29-54.) A week later, she issued a written decision denying Plaintiff's claims, which became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on January 29, 2014, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On February 27, 2014, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

### B.    Standard of Review

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's

2

initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting

*Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.    Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-85. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who

have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past

relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the application date, despite working a few months in 2008. (Tr. at 16.) The ALJ also found that he met the insured status requirements through September 30, 2009. (*Id.*) At step two, the ALJ concluded that Plaintiff had the following severe impairments: "a history of polysubstance abuse, history of a seizure disorder, bipolar disorder, anxiety disorder, and depression . . . ." (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 17-19.) The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform work at all exertional levels–heavy, medium, light, and sedentary, 20 C.F.R. §§ 404.1567(b), 416.967(b)–with additional non-exertional restrictions. (Tr. at 19-22.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 23.) At step five, the ALJ found that a significant number of jobs existed suitable to Plaintiff's limitations. (Tr. 23-24.)

### E.    Administrative Record

### 1.    Medical Records

Plaintiff's medical record begins well after his alleged 2003 onset date. The earliest report describes emergency treatment for drug withdrawal symptoms on January 22, 2009. (Tr. at 323-29.) The examination was normal; while a computed tomography ("CT") scan of his head showed chronic white matter ischemic changes, the doctor characterized the results as "essentially normal." (Tr. at 327, 324, 328, 331.) Other tests, including an electrocardiogram ("EKG") and chest scans, were also unremarkable. (Tr. at 330-32.) Plaintiff was confused and disoriented during the initial evaluation, so his medical history was obtained from other records and by a phone call to his current "roommate/boyfriend." (Tr. at 324.) He had a history of drug abuse, particularly Valium and heroin, according to the roommate. (Tr. at 327.) Recently, he began taking methadone and had not used Valium or Vicodin for seven to ten days. (Tr. at 323-24, 327-28.)

The next day Plaintiff, still in the hospital, was examined by Dr. Pnitha Vijayakumar. (Tr. at 326-27.) He had begun hallucinating and "hitting himself," according to Plaintiff's sister, "so she brought him to the hospital." (Tr. at 326.) About a week prior, Plaintiff stopped using "Xanax, Valium, heroin, [and] alcohol," after going to a methadone clinic; his mental state had decreased since. (*Id.*) During the decline, he experienced at least one seizure. (*Id.*) Dr. Vijayakumar thought Plaintiff now seemed "a little bit better," as the hallucinations had stopped; but his memory remained foggy. (*Id.*) He did recall going to a rehabilitation program fifteen years ago, otherwise his medical history was unexceptional and he claimed "nothing is a problem at this time." (Tr. at 326-27.) Drug and alcohol withdrawal had caused the episode, the doctor concluded. (Tr. at 327.)

Dr. Keon Chang also examined Plaintiff. (Tr. at 325-26.) Plaintiff informed him that the methadone clinic had increased his dosages "to the point that he could not function," and that the day he arrived at the hospital he had used heroin, likely causing the overdose. (Tr. at 325.) "He

8

absolutely denied having had *suicidal* thought, or intention, or attempt [sic]." (*Id.*) Denying alcohol abuse, Plaintiff explained that he suffered depression since "he lost his roommate . . . in October [2008]." (*Id.*) He had "taken care of this male friend for the last 28 years[,] as [the friend] had been disabled . . . ." (*Id.*) He had "no significant history of treatment for depression or any psychiatric disorder," but did have a twenty year history of substance abuse. (*Id.*) Dr. Chang observed that Plaintiff was alert and cooperative, spoke pleasantly, made eye contact, and provided reliable medical history. (*Id.*) Psychosis did not seem to play a role, as Plaintiff denied delusions and hallucinations. (*Id.*) The final diagnosis was opiate dependence and benzodiazepine abuse; Dr. Chang also wrote, "Probably situational disorder or adjustment disorder with depression." (Tr. at 325-26.) He recommended a rehabilitation program and Plaintiff agreed, stating he wanted a normal life without addictions and also planned to get a job. (Tr. at 326.)

After a week in the hospital Plaintiff was discharged and began an intensive outpatient rehabilitation program. (Tr. at 323, 281.) On the intake form, he wrote that his purpose for seeking treatment was "to stay off drugs, and to deal with a good friend[']s death." (Tr. at 281.) His treatment history included a rehabilitation program in 1988, methadone clinic visits, and the recent emergency room detoxification. (*Id.*) He had received no mental health treatment and had never attempted suicide. (Tr. at 281-82.) His symptoms included depression, guilt, anxiety, sleeplessness, low self-esteem, and weight fluctuations, but no suicidal or homicidal ideations. (Tr. at 282.) His relationship with his father was "good . . . but somewhat distant," while his relationship with his mother was "very good" and with his siblings, "good." (Tr. at 282.) He had no "disability or limitation" which could keep him from participating in treatment. (Tr. at 283.)

The form then asked about his social history. (*Id.*) He divorced after five years of marriage and was currently in a "good" long-term relationship of over five years; the only present source of conflict was financial, not drug use or mental health issues. (*Id.*) He finished high school and attended trade school to become a medical assistant. (*Id.*) He did not work, yet he said employment provided a source of income. (Tr. at 283-84.) His social life had only "acquaintances," though he did not check the box that would indicate he had "[n]o close friends." (Tr. at 284.) He admitted he drank alcohol, used drugs, and smoked cigarettes, (Tr. at 285), about two packs a day his friend estimated. (Tr. at 328.)

The form then presented a long list of problems for Plaintiff to rate. (Tr. at 286.) At admission to the program, he said the following, among others, were not a problem: using drugs and alcohol; hurting others; anxiety; mood changes; anger; self-destruction; obsessive thoughts; physical problems; social isolation; difficulties in relationships; lack of support system; stressful home environment; and family. (*Id.*) His only "minimal problem" was not trusting others. (*Id.*) Among the "[m]ild problem[s]" were "thinking about hurting myself," depression, compulsions, and difficulty making decisions. (*Id.*) "Moderate" problems included reckless behavior, causing others emotional harm, confused thoughts, adhering to prescriptions, and participating in recreation. (*Id.*) His grief and insomnia were the only "[s]erious" problems, and his single "[v]ery severe problem" was finances. (*Id.*) The next intake sheet focused on his physical issues. (Tr. at 289.) Pertinent past problems included thyroid problems, dizziness, and alcohol and drug use; current issues were visual, high blood pressure, seizures, insomnia, severe headaches, weight fluctuations, and tobacco use. (*Id.*) He had no problems with numbness, paralysis, tingling, or

10

weakness, and no pain in his back, chest, neck, or any other area. (*Id.*) He also ground his teeth at night, causing them to crack. (*Id.*)

The intake evaluation was signed by a certified counselor and later by a physician. (Tr. at 275-80.) The counselor observed normal motor activity, and unremarkable speech. (Tr. at 275.) Plaintiff cooperated pleasantly, and displayed proper orientation, normal thoughts, average intelligence, normal memory, and fair insight and judgment. (Tr. at 275-76.) Yet he cried, came across as depressed, and had poor impulse control. (*Id.*) The next part of the evaluation detailed Plaintiff's extensive drug use history. (Tr. at 277.) The counselor noted no past aggressive behavior, recklessness, or injuries. (Tr. at 278.) Plaintiff did not report any pain. (*Id.*) Hygiene, nutrition, shopping, and transportation were not problematic daily activities; leisure and lack of exercise were. (Tr. at 279.) His social skills were problematic because he isolated himself and lacked sober friends; he also remained unemployed and continued to grieve. (*Id.*)

The next record from the rehabilitation program was an evaluation by Dr. Edward Lamsen shortly before Plaintiff's discharge. (Tr. at 267, 292-98.) Plaintiff said he had felt depressed at various times over the last eight years, sometimes wishing for death but never planning or attempting suicide. (Tr. at 292.) In October 2008, the patient he provided home health care to for twenty-eight years died suddenly, triggering the recent depression. (*Id.*) The history portion lists a psychiatric hospital admission in 1975. (*Id.*) He had no current medical, including psychiatric, treatments. (*Id.*) He "got along well" with his boyfriend of six years. (Tr. at 293.) Dr. Lamsen wrote that Plaintiff appeared clean, oriented, cooperative, fidgety, distractable, and while his concentration and memory were impaired, his thought process was goal oriented and productive. (Tr. at 294-95.) He did not have hallucinations. (Tr. at 295.) Sadness was evident and affected his

11

functioning, but he did not contemplate suicide and presented no risk of self-harm. (Tr. at 295-96.) His judgment and impulse control were adequate, at present, and he was amicable with undiminished social skills and a support system of family and friends. (Tr. at 297.) The diagnoses included drug dependency and depression; Plaintiff's Global Assessment of Functioning ("GAF") score was forty-two.[2]

Four days after that session, Plaintiff completed the program and was discharged. (Tr. at 267.) His GAF score had edged up to forty-eight but stayed in the same general range as before. (*Id.*) The physical conditions monitored during the program included high blood pressure and seizures, both of which responded well to treatment. (Tr. at 269.) Over the course of the program, Plaintiff's anxiety, substance abuse, depression, grief, and sleep disturbances had improved. (Tr. at 270.) Additionally, he marked improvements in many of the items he listed at admission: his recklessness was now minimal; he did not consider hurting himself; his management of medical problems was only a mild issue; his grief had moderated; his diet had balanced; his confusion, at first a moderate problem, was now only minimal; medication adherence had improved; difficulties with decisions were now minimal; and his financial stresses were now moderate. (Tr. at 286.) However, his depression remained the same–a mild problem–and his anxiety, fearfulness, and self-destructiveness now also became mild problems. (*Id.*) He participated eagerly, establishing a therapeutic bond, never missing a session, and complying with his prescriptions. (Tr. at 270.) He had a support system and adequate resources to preserve his general health. (Tr. at 271.)

---

[2] This score indicates serious symptoms or impairments in "social, occupational, or school functioning." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000) (hereinafter "DSM-IV"). The most recent DSM, however, rejects the use of GAF scores. Am. Psychiatric Ass'n, DSM 16 (5th ed., 2013).

Continuing problems included employment, finances, transportation, and lack of a primary physician. (*Id.*) His psychological state and prognosis were both "[g]ood" at discharge. (*Id.*)

His next two treatment notes were nearly two-and-a-half years apart, both dealing with abscesses on his arm. (Tr. at 301-23.) The first, in November 2009, was unexplained in the notes, but the second, in March 2012, came after he cut his hand while working on his bathroom shower. (Tr. at 302.) However, he later told another examiner that the abscesses developed from intravenous drug injections. (Tr. at 534.) Relevant here, his physical examination was normal aside from the hand issue: he was alert, had no neurological deficits, and he denied any other complaints (Tr. at 305, 310.)

He applied for disability in July 2012, (Tr. at 163, 169), and he was hospitalized for nearly a week the next month with depression and suicidal ideations. (Tr. at 396, 437.) He informed the intake evaluator that he had used cocaine, Xanax, and heroin over the past four years. (Tr. at 397, 408.) No auditory or visual hallucinations had occurred, however, and despite suicidal thoughts, he had no plans or intentions to act on them. (Tr. at 397, 404.) Explaining his past psychiatric history, he noted inpatient treatment in the 1980s during his divorce and his relapse in 2009 after his friend's death. (*Id.*) Years ago he had cut his wrist, but required no treatment, and six months prior, he considered slashing his throat. (*Id.*) Other notes indicate a possible recent suicide attempt by overdose. (Tr. at 407.) The drug habit drained his finances, preventing him from paying property taxes. (Tr. at 398.) As a result, he lost his house and had stayed with his sister for the last ten days. (*Id.*) His recent relationship ended a week prior after his boyfriend physically assaulted him. (*Id.*) He told the staff that he had served in the army and had difficulty "coping with

13

employment." (Tr. at 409.) A note from his last day stated Plaintiff had fallen out with many family members, limiting his social support group. (Tr. at 430.)

The intake evaluator observed Plaintiff's poor grooming, but noted he was alert, had fair eye contact, no psychomotor difficulties, and had poor concentration. (Tr. 398.) Over his hospital stay, his mood, sleep, and appetite improved and he continued to deny hallucinations. (Tr. at 398, 403.) During an early mental health evaluation, he appeared flat, had difficulty speaking, avoided interaction, and did not follow one-step commands.[3] (Tr. at 411.) However, he was also cooperative and pleasant, followed directions, and had intact memory and concentration. (*Id.*) Except for pneumonia, his physical examination was unremarkable. (Tr. at 401, 437-39.) His back and musculoskeletal system had normal strength and range of movement; he also displayed normal coordination. (Tr. at 440.) The notes state he walked frequently, his gait was weak, and he had no mobility limitations.[4] (Tr. at 409-10.) The notes on his functioning report show no problems with communication or activities of daily living. (Tr. at 410.)

By the following day, he had improved in some areas but now displayed short-term memory deficits and decreased concentration. (Tr. at 412.) The memory problems persisted the next day, though his concentration had returned and his mood was euthymic. (Tr. at 413.) However, other notes from that day found his memory intact. (Tr. at 424.) He told staff that he enjoyed reading and bicycling. (*Id.*) His improvements continued during the next evaluation, his memory returning and

---

[3] His GAF score at intake was twenty-five, indicating his behavior was "considerably influenced by delusions or hallucinations" or he had serious communication or judgment impairments. DSM-IV, *supra* at 4. As noted, the GAF system was removed from the recent DSM.

[4] These observations came within Braden Scale measurements. (Tr. at 409.) The Braden Scale is used to predict a patient's risk of developing pressure ulcers. U.S. Nat'l Library of Med., *2012AB Braden Scale Source Information*, April 17, 2013, *available at* http://www.nlm.nih.gov/research/umls/sourcereleasedocs/current/LNC_BRADEN/.

his mood staying euthymic. (Tr. at 414.) The progress remained on the following day, when he was discharged to a rehabilitation program. (Tr. at 399, 415.) Throughout, he denied hallucinations. (Tr. at 411-15.) He also actively participated in group and recreational therapy sessions. (Tr. at 418-23, 433.) He enjoyed a "structured cooking group" class, supported peers in a behavioral group session, initiated conversations in another workshop, properly focused on a movie during a recreational session, was "very detail oriented and focused" making crafts in one session, had good energy, and interacted well with others, using humor and providing "appropriate input." (*Id.*)

The day after discharge, Plaintiff entered the rehabilitation program. (Tr. at 530.) His strengths, noted over the first month, were "a friendly personality," "a good sense of humor," and "a recent work history that is satisfactory." (Tr. at 523.) Apparently, his mother's recent death was one of the precipitating factors leading to his increased drug usage and resulting hospitalization. (Tr. at 520.) He lost forty pounds since she died, but had "no salient physical problems." (*Id.*) The counselor noted he was friendly and highly motivated, with "a lot of job skills and training" and a positive support system. (*Id.*) His relationship with his boyfriend was positive and he planned to return to their home, though his sister, who continued providing material support, thought the relationship was bad and would not let him return to her house while he was in it. (*Id.*) A mental status examination at admission found his mood appropriate, his insight unimpaired, no suicidal or homicidal orientations, and normal speech, thought processes, perception, and orientation. (Tr. at 528.) The tentative GAF was sixty one, suggesting moderate symptoms or functioning difficulties. DSM-IV, *supra* at 34.

He progressed during the treatment, reporting he felt "freer" than ever before and discussing his next steps; he planned to get an "interest inventory" and said he leaned toward an "LPN," or

licensed practical nurse degree. (Tr. at 521, 547.) He was discharged in December 2012 after he "successfully completed long[-]term residential care." (Tr. at 525.) He left with a diagnosis of opioid dependence, and a GAF score indicating moderate and severe "[l]ife [s]tressors," including housing, economic, and occupational problems. (*Id.*) The counselor reiterated Plaintiff's friendly personality, sense of humor, and satisfactory recent work history. (Tr. at 526.) His symptoms stayed roughly the same, but the discharge report stated his treatment plan effectively improved his psychological condition. (*Id.*) After-care treatment would begin in a few days. (*Id.*)

Plaintiff had a consultative physical examination with Dr. Cynthia Shelby-Lane, M.D., on January 31, 2013, for the state agency administering benefits. (Tr. at 533-36.) His chief complaints were "depression, anxiety, bipolar disorder, seizures, drug addiction, arthritis, hypertension and high cholesterol." (Tr. at 533.) The mental illnesses began in 1975 and had caused multiple hospitalizations. (*Id.*) They continued to manifest in "chronic mood swings, anger, crying spells, sadness[,] and suicidal thoughts," though he continued taking prescriptions. (*Id.*) The seizure disorder first occurred in 2008, with five subsequent hospitalizations, most recently in 2011. (Tr. at 533, 535.) He took his medications for both his mental issues and the seizures; his hypertension and hyperlipidemia were not currently treated. (Tr. at 533-34.) Plaintiff last worked in 2008. (Tr. at 534.)

During the physical examination, Dr. Shelby-Lane observed that Plaintiff was cooperative, alert, oriented, and dressed appropriately. (*Id.*) His lungs were clear and his other systems were normal. (Tr. at 535.) His extremities showed no abnormalities and he did not use or need a cane for walking. (Tr. at 535, 540.) His gait was slightly off to the right, his tandem, heel, and toe walk were slow, and he could bend and squat seventy percent of the "distance." (*Id.*) His stance was

16

normal, however, and his arms had normal strength and reflexes, his shoulders and knees had normal range of motion. (Tr. at 535, 537-39.) The diagnoses included depression, anxiety, seizure disorder, a history of right hip arthritis with chronic pain, and hypertension and hyperlipidemia. (Tr. at 535.) The doctor concluded that Plaintiff should continue treating his drug addiction and "may have difficulty with prolonged standing on the right side." (*Id.*) The notes add, however, that he could complete all of a long list of functions, such as standing, bending, stooping, pushing, pulling, sitting, and similar actions. (Tr. at 539.)

Later in January, Dr. David L. Hayter, Ph.D., conducted Plaintiff's mental health consultative examination. (Tr. at 542-45.) Plaintiff recounted his medical history, beginning with his seizures in 2008; the etiology of the disease remained unknown. (Tr. at 542.) He now dated his most recent seizure in July 2012. (*Id.*) Describing his arthritis, he said it was first diagnosed in his neck in 1996, and it now was also in his right shoulder and hip. (*Id.*) Generally at pain level four-out-of-ten on an ascending scale, it sometimes jumped to level seven. (*Id.*) Moving on to his social history, he informed Dr. Hayter that his mother passed away in 2008, his father in 2011. (Tr. at 543.) He denied serving in the army. (*Id.*) He had a driver's license but no car; he lost that along with his house and friends in 2010, he reported. (*Id.*) His last job was at a carpentry business from 2008 until 2010, when the company closed. (*Id.*) During a typical day, he would awake after a fitful night's rest, but felt refreshed and alert. (*Id.*) He spent the day doing chores at the "center," though he stayed away from others. (*Id.*) "His general interests [were] watching [television], reading, bowling, fishing, riding a bike,[,] and walking." (*Id.*)

Dr. Hayter's examination began by noting Plaintiff's erect posture, normal gait, normal motor activity and coordination, and cooperative attitude. (*Id.*) His speech was normal and

expressive. (*Id.*) Plaintiff was treating his depression and anxiety with a doctor and reported feeling "some anxiety" in public about whether people were staring at him and negatively judging him. (Tr. at 543-45.) He denied auditory hallucinations but sometimes saw wavy images that "may be illusions versus hallucinations." (*Id.*) His affect was blunted and his mood, depressed. (Tr. at 544.) In 2000, Plaintiff's life spiraled downwards as he divorced and lost his job at a repair shop where he thought he would retire. (*Id.*) The bipolar disorder was first diagnosed in 2010, and he stated that when the friend he took care of passed away around that time, he lost his "purpose for living . . . ." (*Id.*) Medications had helped, he reported. (*Id.*) He intended to return to school and become a medical assistant. (*Id.*) Suicidal thoughts sometimes occurred; he never acted upon them however. (*Id.*)

Plaintiff was alert, oriented, and had recent and remote memories. (*Id.*) Results further indicated his "immediate attention is intact," and his abilities to sustain attention and concentration "may" have deficits. (Tr. at 545.) He could "acquire and use information" and "demonstrated the ability to attend to task[s] presented during the examination session," Dr. Hayter wrote. (*Id.*) Plaintiff interacted appropriately, seemed able to care for himself, "ask questions and follow simple directions," "understand, retain[,] and follow simple instructions," and could generally only perform "simple, routine, repetitive, concrete, tangible tasks." (*Id.*) The final diagnoses were adjustment disorder with depressed mood, substance dependency "in [r]ecent [r]emission," and a GAF score of sixty. (*Id.*) He needed a guardian to manage funds. (*Id.*)

Two doctors reviewed Plaintiff's records the next month. (Tr. at 71-75.) Dr. Quan Nguyen, M.D., provided a residual physical function assessment limiting Plaintiff to a range of medium work. (Tr. at 73-75.) Plaintiff could occasionally lift and carry fifty pounds, twenty-five pounds

frequently; stand or walk for six hours in an eight-hour workday; sit for six hours in a workday; and had various, minor postural and environmental limitations. (Tr. at 74-75.) Dr. Nguyen acknowledged the arthritis allegations, noting the lack of objective evidence and advising that further tests would not change the assessment. (*Id.*) Dr. Jerry Csokasy, Ph.D., gave the mental assessment, finding only mild restrictions in daily living and social functioning and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. at 72.) Plaintiff could "perform simple/routine tasks on a sustained basis." (*Id.*)

Plaintiff began treating at Team Mental Health Services in March 2013, his social worker providing the initial evaluation. (Tr. at 547.) Plaintiff's strengths included caring for people, and he still hoped to earn his nursing degree. (*Id.*) Other abilities were cooking, gardening, and following directions. (*Id.*) His relationship with his sister remained strong, but he was estranged from his brothers. (*Id.*) Challenges still centered on his grief. (*Id.*) Overall, however, he was an emotional "wreck," and struggled to let people "get close." (*Id.*) He lacked income and was "working towards obtaining income until SSI comes through," he said. (*Id.*) Also, he had no permanent housing, instead he stayed at the inpatient program after his discharge. (Tr. at 548.) Meaningful activities included reading and "helping others and lending an ear," he said, adding, "I like being that guy they know they can come to." (*Id.*) Nonetheless, he had no close friends. (*Id.*) His health was "generally good," his sister and another formed his support system, and he was "seeking employment. (*Id.*)

Dr. John Head, a psychiatrist, evaluated Plaintiff at Team Mental Health Services on March 18, 2013. (Tr. at 567.) Plaintiff had a litany of complaints: "sadness, loss of interest, guilt, hopelessness, low energy, decreased appetite, insomnia, anxiety, racing thoughts, rapid mood

swings, irritability, agitation, forgetfullness [sic], poor concentration, loss of libido[,] and paranoia." (*Id.*) All of these had beset him for over a decade, he claimed. (*Id.*) He also described his back, neck, right hip, and shoulder problems. (*Id.*) "[T]he patient demonstrated good grooming, timeliness, [proper] orientation[,] . . . sadness, nervous mood, irritable behavior, fidgetiness, good eye contact, anxious appearance, normal speech, intact judgment, logical and coherent thought process, obsessions present, paranoid delusions, no psychosis evident, fair insight and average intelligence." (*Id.*) The diagnoses were severe bipolar disorder with psychotic features, opioid dependence, and a GAF score of forty-six. (*Id.*)

Brief check-up notes from that month and the next consistently indicated he was not suicidal and had no new health issues. (Tr. at 554, 560.) In his April 25, 2013 session, the notes remained the same, except Dr. Head no longer observed sadness, nervous mood, irritable behavior, fidgetiness, and Plaintiff now also displayed "calm behavior with social smile" and was pleasant with "happy interaction[s]." (Tr. at 563.) He was not suicidal or a risk to others and the other diagnoses remained the same. (*Id.*) Dr. Head recommended psychotherapy and adjusted Plaintiff's medications. (*Id.*)

In May, Dr. Head filled out a state agency mental RFC form asking him to rate Plaintiff's limitations in twenty different activities. (Tr. at 569-70.) There were four ratings available: (1) "No Evidence of Limitation," which indicates that "there is no evidence of limitation of the activity based on the nature of the illness and the rater's clinical experience"; 2) "Not Significantly Limited," indicating the disorder "does not prevent the individual from consistently and usefully performing the activity"; (3) "Moderately Limited," where the individual's capacity to perform the given activity "is impaired"; and (4) "Markedly Limited," meaning the individual could not

20

"usefully perform or sustain the activity." (Tr. at 569.) Of the twenty activities, Dr. Head found "No Evidence of Limitation" in fourteen: his ability to remember locations and work procedures; understand and remember one or two-step instructions, understand and remember detailed instructions; carry out simple and detailed instructions; maintain attention and concentration for extended periods; perform scheduled activities, punctually and with regular attendance; work without supervision; work with others without distraction; make simple work-related decisions; interact appropriately with the public; ask simple questions or request assistance; notice hazards and take precautions; travel to unfamiliar places and use public transportation. (Tr. at 569-70.) Plaintiff was "Moderately Limited" in five categories: accept instructions and criticism from supervisors, get along with peers without distracting them or "exhibiting behavioral extremes"; maintain appropriate behavior and stay neat and clean; adapt to change in the work setting; and set realistic goals and plans. (Tr. at 570.) In one category, Plaintiff was markedly limited: completing a normal workday "at a consistent pace without an unreasonable number and length of rest periods." (Tr. at 569.)

### 2.    Application Materials and Administrative Hearing

On September 13, 2012, Plaintiff filled out a Function Report detailing his problems. (Tr. at 222-29.) His main impediments were his inability to focus, follow through, get along with others, and maintain regular attendance. (Tr. at 222.) On a normal day, he ate, watched television for four to six hours, read for over one hour, and showered. (Tr. at 223, 226.) Before his illnesses, but not now, he could "take care of [a] household . . . [and] cut grass." (Tr. at 223.) Yet, in response to a later question, he said he could clean a house, do laundry, and mow a lawn. (Tr. at 224.) He needed no help with personal care aside from occasional reminders to shave, shower, or

21

the like, but he never needed nudges to take his medicine. (Tr. at 223-24.) He could prepare meals, though he no longer cooked "complete meals." (Tr. at 224.) He was outside a few times each day, either walking or riding in cars, and he could also drive. (Tr. at 225.) For example, he went grocery shopping. (*Id.*) Finances were somewhat more difficult; he could pay bills and count change, but not handle a checkbook or savings account because he was "unable to keep figures in order." (*Id.*) He did not spend time with others, stating he grew anxious and angry and had trouble interacting. (Tr. at 226-27.)

His difficulties centered in a few areas: walking, memory, concentrating, understanding, following instructions, and getting along with others. (Tr. at 227.) He could walk three to four blocks before resting and pay attention for ten to fifteen minutes. (*Id.*) He struggled to remember spoken instructions and interact with authority figures, though he was never fired for social problems. (Tr. at 227-28.) Stress and change were difficult, but he had not noticed any unusual behavior or fears. (Tr. at 228.) His only assistive device was a pair of unprescribed reading glasses. (*Id.*)

His work history included various jobs from 1987 through late 2003, and again from October to December 2008. (Tr. at 207, 213-221.) He also took care of a quadriplegic friend. (Tr. at 207, 221.) Plaintiff would dress him, carry him thirty feet from his bed to his wheelchair, helped wash him, fixed his meals, and did his laundry "everyday for 28 years in exchange for room [and] board." (Tr. at 221.)

At the administrative hearing on September 4, 2013, Plaintiff testified that he still resided at the rehabilitation house connected with the program he finished in December 2012. (Tr. at 32-33.) Plaintiff last worked in 2008 as a home health aide for "an older gentleman with dementia."

22

(Tr. at 33.) He helped with dressing, personal care, and light housekeeping, "[m]ainly cooking." (Tr. at 33-34.) The job ended when the individual's family decided he needed full-time care. (Tr. at 34.) Prior to that, he worked at a laundry in 2003, sometimes carrying bags as heavy as fifty pounds. (*Id.*) In earlier positions, he lifted from fifty to eighty pounds. (Tr. at 34-35.)

Plaintiff had a driver's license but struggled to concentrate when driving. (Tr. at 35.) On a typical day, he dressed and assisted in the kitchen, staying away from people. (*Id.*) Then he lied down until lunch, ate, then rested again until dinner. (Tr. at 35-36.) After that, cleaned, watched television and went to bed. (Tr. at 36.) Kitchen pans could be as heavy as thirty to fifty pounds; he needed to cart these because he could only lift around twenty-five pounds. (Tr. at 41.) Even pushing the cart was tiring, forcing him to take breaks due to hip pain. (Tr. at 42.) In addition to helping with meals, he swept and occasionally mopped; the program had a laundry service provided for them. (Tr. at 36.) About six to eight days per month, his depression prevented him from assisting at all. (Tr. at 45.) During manic stages, generally three to five times per month, his erraticness kept him off task as well. (Tr. at 45-46.) Occasionally, he struggled understanding storylines in television shows or his books. (Tr. at 37.) He shopped with his sister, but again asserted his discomfort around crowds at stores. (*Id.*) He did not attend other social events unless he had to, he claimed. (Tr. at 36-37.)

Walking for fifteen to twenty minutes hurt his right hip, and standing still was even worse. (Tr. at 37.) The fifteen- to twenty-minute walks were interrupted by breaks and the standing was really leaning on objects for support, he explained. (Tr. at 44-45.) He talked to a few doctors about the pain but they had not taken any x-rays or MRIs of the hip. (Tr. at 37.) After his insurance ran out he could no longer afford his medications, and he had not taken any for two weeks. (Tr. at 38.)

23

The prescriptions included anti-depressants and a pain reliever for his hip and shoulder. (*Id.*) He noticed his symptoms worsening now that his prescriptions ran out. (Tr. at 46-47.) They helped, along with the program treatment, he admitted, but he still suffered depression and mania. (Tr. at 48-49.)

His depression had various symptoms, including cluttered thoughts, discomfort in public, agitation, and tearfulness. (Tr. at 38.) Trying to keep these symptoms "in check" was helping, he asserted. (Tr. at 38-39.) His depression stages were more frequent than manic periods, which lasted a few days. (Tr. at 39.) He saw a counselor every two weeks, his psychiatrist once a month, and he did not attend any meetings. (Tr. at 40.) He last used illegal drugs in August 2012. (*Id.*) He ended by noting his anxiety about losing insurance and not having permanent housing. (Tr. at 49-50.) His sister no longer had the ability to take him in, and his current housing lacked water and electricity and he would need to be out at the end of the month in any case. (*Id.*)

The vocational expert ("VE") then testified that Plaintiff's past work included medium and heavy exertional-level jobs. (Tr. at 50-51.) The ALJ then asked the VE to assume an individual with no exertional limitations who must avoid hazards; could not commercially drive, or climb ladders, ropes, or scaffolds; was limited to unskilled work; and had no interaction with the public and only occasional interaction with co-workers. (Tr. at 52.) That person could not perform any of Plaintiff's past work, the VE testified. (*Id.*) However, other jobs would remain available: hand packer (7000 positions in Michigan) and cleaner (1500 in Michigan). (Tr. at 53.) The VE added that more than one absence a month precluded all work. (Tr. at 52.) Plaintiff's attorney then asked whether someone who was markedly limited–unable to usefully perform or sustain an activity–in

24

the ability to complete a workday could perform any positions. (Tr. at 53.) No, the VE responded, work was unavailable if the individual was off task more than ten percent of the day. (*Id.*)

## F.   Analysis and Conclusions

### 1.   Legal Standards

The ALJ determined that Plaintiff had the RFC to

> perform a full range of work at all exertional levels but with the following nonexertional limitations: that the claimant must avoid exposure to hazards and commercial driving. The claimant must also avoid climbing ladders, ropes, and scaffolds. The claimant is limited to unskilled work without interaction with the public and only occasional interaction with co-workers.

(Tr. at 19.) After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.   Substantial Evidence

#### a.   Plaintiff's Argument

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff makes two arguments. First, he contends that the ALJ improperly weighed Dr. Head's opinion evidence. (Doc. 12 at 4-9.) As a treating source opinion, Plaintiff explains, Dr. Head's statements were entitled to controlling weight unless the ALJ found they were not supported by objective evidence and then offered "good reasons" for giving them less deference.

25

(*Id.* at 4-6.) He says the ALJ discounted Dr. Head's opinion for two reasons: (1) the severity of the limitations he described was unsupported by his treatment notes; and (2) the opinion was internally inconsistent because Dr. Head found no evidence of memory or concentration limitations but concluded Plaintiff could not complete a normal workday. (*Id.* at 7.) The ALJ misinterpreted Dr. Head's assessment form, Plaintiff claims. (*Id.*) In particular, the understanding and memory abilities deal with "understanding and remembering job tasks and instructions, not [with] whether the individual can carry out the job tasks and instructions on a sustained basis." (*Id.*) Further, the ALJ mischaracterized the findings, erroneously stating that Dr. Head failed to include any "sustained concentration and persistence" limitations. (*Id.* at 8.) Yet, Plaintiff's one marked limitation came under the broader "concentration and persistence" category. (*Id.*) Finally, the treatment notes included evidence bolstering Dr. Head's conclusions, contrary to the ALJ's assertion. (*Id.*) Specifically, it provided a list of symptoms that Plaintiff suffers. (*Id.*)

Next, he claims that substantial evidence does not support the RFC. (*Id.* at 10-14.) He first attacks the ALJ's decision to classify the right hip arthritis, among other impairments, as non-severe at step two. (*Id.* at 11.) This disregarded the consultative examiner's acceptable medical diagnosis of arthritis and opinion that Plaintiff would struggle with prolonged standing. (*Id.*) That opinion was backed by observations that Plaintiff had pain when he stood, bent, stooped, carried, pushed, pulled, squatted and arose from squatting, climbed stairs, and got on and off of the examining table. (*Id.*) Plaintiff's testimony corroborated this pain, but the ALJ ignored that as well. (*Id.* at 11-12.) Had she credited the opinion and testimony, as she should have, Plaintiff asserts that the occupational base would have been eroded to light or sedentary exertional levels, since medium work generally involved standing six hours out of an eight-hour workday. (*Id.* at 13 (citing SSR

26

83-10, 1983 WL 31251 (1983)).) At either the light or sedentary level, Plaintiff's age and background would have required the ALJ to find him disabled under the Commissioner's Vocational Grid Rules. (*Id.* at 13-14.) Finally, the RFC did not account for Dr. Head's notes that indicated Plaintiff would have difficulty relating to supervisors. (*Id.* at 14.) Thus his hypothetical was incomplete as well, making his reliance on the VE's testimony improper. (*Id.*)

Defendant responds that the ALJ's analysis was proper. (Doc. 13 at 14-21.) Dr. Head did not explain how Plaintiff could have no deficits in concentration and persistence other than the incapability of maintaining a normal schedule. (*Id.* at 15-16.) Further, Defendant refutes Plaintiff's contention that the ALJ mischaracterized the concentration and persistence evidence, noting that other than the inability to maintain a normal schedule, Dr. Head found no other limitations, even in those abilities such as maintaining attention and concentration for extended periods and performing scheduled work with regular attendance. (*Id.*) This adequately highlighted the opinion's tensions. (*Id.* at 17.) Moreover, contrary to Plaintiff's argument, Dr. Head's notes do not substantiate his opinions–everything Plaintiff cites from the notes are his own subjective complaints. (*Id.*) As an example, Defendant notes that Dr. Head found no evidence of psychosis. (*Id.* at 16.)

Defendant also argues that the RFC was sufficiently supported. (*Id.* at 18-21.) Dr. Shelby-Lane, the consultative examiner, opined only that Plaintiff "'may have difficulty with prolonged standing on the right side.'" (*Id.* at 18 (citing (Tr. at 535)).) The ALJ noted the observation of a slight limp giving rise to this possible limitation; but these tentative claims did not bind the ALJ. (*Id.*) Additionally, Plaintiff failed to add that despite noticing some pain during certain activities, Dr. Shelby-Lane concluded that he could perform them all. (*Id.* at 18-19.) Other evidence,

including Plaintiff's own observations, support the ALJ's assertion that the medical evidence did not bear out Plaintiff's complaints. (*Id.* at 19.) The ALJ also considered Dr. Nguyen's opinion, finding it too restrictive. (*Id.* at 20.) Next, even if the ALJ erred at step two by not finding the hip pain severe, this would not warrant remand because the ALJ was required to consider even non-severe impairments when constructing the RFC. (*Id.* at 20-21.) Finally, the ALJ did not err by failing to incorporate Dr. Head's opinion on Plaintiff's ability to work with supervisors. (*Id.* at 21.) The ALJ properly discounted those opinions and cited Dr. Csokasy's statement that Plaintiff could interact with authority figures. (*Id.*)

Plaintiff replies with a barrage of accusations and new arguments. (Doc. 14.) First, he claims that Defendant offered impermissible post-hoc rationalizations not used by the ALJ. (*Id.* at 1-2.) Which of Defendant's arguments fit this bill, Plaintiff leaves vague. He suggests Defendant's analysis of Dr. Head's opinion produced these new arguments, but does not offer citations or explanations from Defendant's brief. (*Id.* at 2-3.) Instead, he simply concludes that "[t]he reasons given by Defendant are purely speculation and have no support in the ALJ's own determination." (*Id.* at 3.) Perhaps Plaintiff means to refer to Defendant's observation that Dr. Head found no evidence of psychosis, which he next discusses. (*Id.*) Dr. Head did find obsessions, paranoia, and sadness, and in fact diagnosed bipolar disease with psychotic features. (*Id.*)

Plaintiff next offers new arguments about Dr. Head's opinion. (*Id.* at 3-4.) In particular, he rejects Defendant's discussion by arguing that Dr. Head did not mean to suggest that Plaintiff lacked limitations in the areas in which he found no evidence of limitations. (*Id.*) Instead, the form defined the "No Evidence" rating as no evidence "based on the nature of the illness [and] the rater's clinical experience." (*Id.* at 3 (citing Tr. at 569).) Somehow, Plaintiff takes this to mean that

"No Evidence" did not equal no evidence. (*Id.* at 3-4.) Rather, "An area where the Doctor did not feel he had the clinical evidence to provide an opinion is not the same as a functional ability. Where Dr. Head felt that he had clinical support, he opined that Plaintiff would not be capable of usefully completing a normal workday . . . ." (*Id.* at 4.) Thus, he explains away any inconsistencies. (*Id.*) Tucked at the end is the renewed assertion–again without citation–that "Defendant only provides post-hoc rationale for the ALJ's flawed analysis . . . ." (*Id.*)

Plaintiff quibbles with Defendant's RFC analysis. (*Id.* at 4-5.) "Defendant's contention" that Dr. Shelby-Lane found him capable of performing every exertional activity "is quite misleading," according to Plaintiff, because the doctor "actually found that [he] experienced significant pain through" most of those activities. (*Id.*) Finally, Plaintiff contends that Defendant admits in her brief that the ALJ rejected all medical opinions on Plaintiff's physical impairments, thus supporting the notion that the ALJ played doctor. (*Id.* at 5.)

> **b.    Medical Source Evidence, Plaintiff's Credibility, and the RFC**

> **i.    Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable

medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). The regulations do not prescribe any similar test for opinions from "other sources." SSR 06-03p, 2006 WL 2329939, at *3. Nonetheless, both the Sixth Circuit and the Commissioner require ALJ's to apply the factors to "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[5] and the application of vocational factors. *Id.* § 404.1527(d)(3).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v.*

---

[5] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

31

*Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

When objective evidence does not support the opinion, the regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *4 (1996) . *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007); *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).. Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5. *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 661 F.3d at 937. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility

determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they

lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken
        to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis, including proving her RFC. *Jones*, 336 F.3d at 474; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have add anything to the RFC, 20 C.F.R. § 404.1560(c), and consequently the burden to prove limitations remains with the Plaintiff at this stage. *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

    **ii.**    **Analysis**

        *a.*    *Post-Hoc Rationalization and Arguments Raised in Reply Briefs*

Before addressing the merits, I turn first to Plaintiff's *Chenery* argument that Defendant offers an impermissible post-hoc gloss on the ALJ's decision. (Doc. 14 at 1-4.) In *S.E.C. v. Chenery*, 318 U.S. 80 (1943) (hereinafter "*Chenery I*") and its sequel, *S.E.C. v. Chenery*, 332 U.S. 194 (1947) (hereinafter "*Chenery II*"), the Court set the boundaries for judicial review of agency decisions, seeking to prevent courts from "intrud[ing] upon the domain which Congress has

exclusively entrusted to an administrative agency." *Chenery I*, 318 U.S. at 89. Explaining its

decision four years later, the Court added,

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery II*, 332 U.S. at 196.

Thus, the government as a litigant cannot provide, and the court cannot accept or develop

on its own, after-the-fact rationalizations for the agency decision "that the agency had not relied

on in its [disputed] decision . . . ." *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010). *See also*

*Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (citing *Chenery I* and holding, "But these are

not reasons that appear in the ALJ's opinion, and thus they cannot be used here"). Every Circuit

has applied the *Chenery* doctrine to social security decisions. *See* Bryan C. Bond, *Taking it on the*

Chenery*: Should the Principles of* Chenery I *Apply in Social Security Disability Cases?* 86 Notre

Dame L. Rev. 2157, 2159 & n.11 (2011) (collecting cases). The Sixth Circuit has applied *Chenery*

*I* in a social security decision, explaining, "[I]n large part, an agency's decision must be affirmed

on the grounds noted in the decision." *Berryhill v. Shalala*, 4 F.3d 993, 1993 WL 361792, at \*7

(6th Cir. 1993).

Plaintiff fails to explain how any of Defendant's particular arguments were post-hoc

rationalizations, instead peppering his discussion with conclusory condemnations. Defendant's

brief hews closely to the ALJ's analysis and even leaves some of it on the cutting-room floor. The

ALJ described all of Dr. Head's pertinent findings and noted the inconsistencies. (Tr. at 21-22.)

36

So does Defendant. (Doc. 13 at 15-16.) The ALJ described Dr. Shelby-Lane's findings, highlighting the largely normal results and the possible difficulties with prolonged standing. (Tr. at 22.) Defendant reiterates that Dr. Shelby-Lane's opinion was tentative. (Doc. 13 at 18.) Elsewhere, the ALJ cited evidence that Plaintiff never sought treatment for some of his alleged physical impairments and the record thus contains hardly any verifying objective evidence outside the consultative opinion. (Tr. at 17, 20, 22.) Defendant cites this discussion. (Doc. 13 at 19.)

Finally, it is not apparent that Defendant cited any evidence the ALJ did not explicitly address. Even so, the Defendant did not need to stay within a hair's breadth of the ALJ's citations. *Chenery* does not prohibit reviewing evidence that fits underneath one of the ALJ's rationales, but which she did not cite. The ALJs do not need to cite every piece of evidence in the record that supports their findings. *See Van Der Maas*, 198 F. App'x at 526; *Kornecky*, 167 F. App'x at 508. Reviewing courts can thus examine the entire record, *Heston*, 245 F.3d at 535, so it makes little sense to fault a defendant for raising evidence that the ALJ considered but did not cite and which supports the ALJ's rationale.

To the extent either party develops unwelcome arguments, Plaintiff's reply brief is perhaps the clearest culprit; but not enough so to disregard these new assertions. (Doc. 14.) Parties cannot raise new arguments or evidence in a reply brief when doing so deprives the other side the opportunity to respond. *See Eng'g & Mfg. Servs., LLC v. Ashton*, 387 F. App'x 575, 583 (6th Cir. 2010) (citing *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 481-82 (6th Cir.2003)); *Martinez v. Comm'r of Soc. Sec.*, No. 09-13700, 2011 WL 1233479, at *2 n.1 (E.D. Mich. Mar. 30, 2011). In his brief, Plaintiff seems to agree, or at least not disagree, that Dr. Head's the "No Evidence" rating in the assessment form indicates that an individual is not limited in a certain ability. (Doc. 12 at

7.) Either way, Plaintiff does not there address the subsequent claim he raises in his reply brief that the "No Evidence" rating simply means that the doctor felt he did not have enough evidence to make any assertion. (Doc. 14 at 3-4.) The argument comprises a significant proportion of his reply brief and is sufficiently distinct from anything argued before, even if it does not clash directly with the implications in his first brief. Nonetheless, because the argument lacks merit, discussing and rejecting it below will not prejudice the defendant.

   *b.*   *Treating Sources and the RFC*

   Plaintiff's arguments fail to persuade. First, the ALJ's analysis of Dr. Head's opinion was adequate. Neither party questions whether Dr. Head constitutes a treating source, but it is worth noting that the record contains only two sessions with Plaintiff before he filled out the form, and none after. (Tr. at 563, 568-70.) To become a treating source, the relationship between the physician and claimant must have been "ongoing." 20 C.F.R. §§ 404.1502, 416.902. That is, treatments or evaluations must have occurred "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s)." *Id.* Infrequent consultations or a brief period of treatment often preclude a source from this category. *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 579 n.16 (W.D. Mich. 2008). *See also Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 414-15 (6th Cir. 2004) (treating a claimant only once is insufficient for treating status); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (same); *Atterberry v. Sec. of Health & Human Servs.*, 871 F.2d 567, 571 (6th Cir. 1989) (same). Moreover, "depending on the circumstances and nature of the alleged condition, two to three visits often will not suffice for an ongoing treatment relationship." *Kornecky*, 167 F. App'x at 506. *See also Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 n.3 (6th Circ. 2011) ("[I]t is questionable whether

38

a physician who examines a patient only three times over a four-month period is a treating source."). Thus, for example, the Sixth Circuit found that two visits within one month were insufficient in *Daniels v. Commissioner of Social Security* because it did not show "a frequency consistent with the treatment of back pain, as evidenced by the fact that he received treatment from other sources on many other occasions." 152 F. App'x 485, 491 (6th Cir. 2005). Only in unusual circumstances will two visits be enough to establish an "ongoing treatment relationship." *See, e.g.*, *Kerkau v. Commissioner of Social Security*, No. 12-11520, 2013 WL 2947472, at *9 (E.D. Mich. June 14, 2013).

Regardless of how Dr. Head is classified, Plaintiff's arguments fail. His attempt to show the ALJ misinterpreted Dr. Hood's opinion form lacks merit. As an initial matter, the form appears nearly identical to Section I of an official Administration form, dubbed SSA-4734-F4-SUP and usually completed by consultative examiners. *See* Soc. Sec. Admin., *Program Operations Manual System* DI 24510.090 (hereinafter "POMS"), *available at* https://secure.ssa.gov/poms.nsf/lnx /0424510090 (last visited) (providing link to form).[6] Aside from inconsequential differences in style, each asks the same twenty questions under the same four broad categories, and each provides the same answers. However, the SSA form also includes a fifth option: "Not Ratable on Available Evidence." *Id.* Also, the POMS contains the same definition of the "No Evidence" rating, but adds that it applies when the "medical evidence does not indicate limitations in a particular area and no limitation would be expected . . . ." *Id.* DI 24510.063(B)(4). The three other ratings have the same definitions as Dr. Hood's form. *Id.* DI 24510.063(B)(1)-(3); (Tr. at 569.)

---

[6] The POMS is not legally binding, but "it is nevertheless persuasive." *Davis v. Sec'y of Health & Human Servs.*, 867 F.2d 336, 340 (6th Cir. 1989).

The similarities are important because the POMS and a sizable body of case law reduce the persuasiveness of SSA-4734-F4-SUP. The POMS calls Section I the summary conclusions portion; it is "*merely a worksheet* to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and *does not constitute the RFC assessment*," which instead is found in Section III. POMS DI 24510.060(2). Accordingly, courts routinely hold that the ALJ need not even consider Section I in the vocational hypothetical or the RFC.[7]

For example, the court in *Wade v. Colvin* rejected the argument that the ALJ erred by ignoring an psychiatric examiner's opinion that the claimant was moderately limited in the same activity at issue here: the ability to complete a normal workday without interruption. No. 12 C 8260, 2014 WL 349261, at *11-12 (N.D. Ill. Jan. 31, 2014). The court explained that the ALJ did not need to incorporate that finding because it came in Section I and was not inconsistent with the

---

[7] *See Nathan v. Colvin*, 551 F. App'x 404, 408 (9th Cir. 2014) (holding the ALJ did not err by failing to use Section I to determine the RFC); *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 636-37 (3d Cir. 2010) (collecting cases holding that "Section I of the form may be assigned little or no weight"); *Brewer v. Colvin*, No. 2:13-CV-28, 2014 WL 794372, at *6-8 (E.D. Tenn. Feb. 27, 2014) (collecting cases and holding that the failure to include limitations in Section I form did not constitute reversible error); *Kane v. Astrue*, No. 1:10CV1874, 2011 WL 3353866, at *3 (N.D. Ohio Aug. 3, 2011) ("Because the actual assessment is contained in Section III, courts have consistently held that it is not error for an ALJ to omit restrictions identified in Section I in his RFC analysis."); *Joiakim v. Comm'r of Soc. Sec.*, No. 10-11079, 2011 WL 1120043, at *6 (E.D. Mich. Mar. 8, 2011) (noting that the ALJ "properly only referred to Section III" of the form, containing the actual RFC), *Report & Recommendation adopted by* 2011 WL 1134655, at * (E.D. Mich. 25, 2011); *Coleman v. Astrue*, No. 3:10cvo464, 2010 WL 4955718, at * 6-7 (N.D. Ohio Nov. 18, 2010) (finding that the ALJ did not need to include Section I limitations in the RFC), *Report & Recommendation adopted by* 2010 WL 4955707, at *1 (N.D. Ohio Nov. 30, 2010); *Dannenberg v. Comm'r of Soc. Sec.*, No. 1:09-cv-811, 2010 WL 5139852, at *1 (W.D. Mich. Aug. 10, 2010) (distinguishing the form from an RFC opinion), *Report & Recommendation adopted by* 2010 WL 5139845, at *3 (W.D. Mich. Dec. 10, 2010); *Kachik v. Astrue*, No. 09-149, 2010 WL 3852367, at *6 (W.D. Penn. Sept. 27, 2010) ("[T]he ALJ was not required to specifically account for the limitations listed in Section I in his RFC or in the hypothetical posed to the vocational expert."); *Velez v. Comm'r of Soc. Sec.*, No. 1:09 CV 0715, 2010 WL 1487599, at *6 (N.D. Ohio Mar. 26, 2010) ("In general, the decisions have respected the Commissioner's argument the ALJ is not required to include the findings in Section I in formulating residual functional capacity."), *Report & Recommendation adopted by* 2010 WL 1487729, at *1 (N.D. Ohio April 13, 2010); *Molloy v. Astrue*, No. 08-4801, 2010 WL 421090, at *11 (D. N.J. Feb. 1, 2010) (holding that the ALJ "was not required to assign *any* weight to this part [Section I] of the report because it was not the final RFC finding"); *Liggett v. Astrue*, No. 08-1913, 2009 WL 189934, at *8 (E.D. Penn. Jan. 27, 2009) (adopting Report & Recommendation) (same); *Berry v. Astrue*, No. 1:08-cv-0005, 2009 WL 50072, at *14-15 (W.D. Va. Jan. 7, 2009) (same)

Section III RFC. *Id.* The Tenth Circuit has echoed that analysis. *See Sullivan v. Colvin*, 519 F. App'x 985, 989 (10th Cir. 2013). Further, relying on Section I over the Section III analysis can constitute reversible error. *Kane v. Astrue*, No. 1:10CV1874, 2011 WL 3353866, at *3 (N.D. Ohio Aug. 3, 2011) .

Here, Dr. Head never completed a specific Section III RFC assessment. That section requires the examiner to identify and discuss specific functions and limitations and the extent to which the claimant could perform and sustain an activity; it prohibits the examiner from offering opinions on whether the individual is disabled or including severity ratings such as "moderate," because they "do not usefully convey the extent of capacity limitation." POMS DI 24510.065. A proper Section III statement would be, for example, that the claimant could "understand, remember, and carry out a two-step command involving simple instructions." *Id.* Dr. Head's actual statements therefore cannot plausibly be viewed as a substitute for the more formal RFC assessment.

Moreover, the existence of other important differences between Section I and an RFC counsels against undue reliance on Section I even when it stands alone. As the Eleventh Circuit has explained, Section I's "Moderate Limitation" only indicates that an impairment exists; "it does not indicate the degree and extent of the limitation," which must come in Section III's "actual RFC assessment." *Land v. Comm'r of Soc. Sec.*, 494 F. App'x 47, 49 (11th Cir. 2012); *see also Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 636-37 (3d Cir. 2010); *Varga v. Colvin*, No. 12-C-1102, 2014 WL 1089740, at *4-5 (E.D. Wis. Mar. 19, 2014). Thus, the form does not align sufficiently with descriptions that are readily translated to an RFC. *See also* POMS DI 24510.065 (stating descriptors such as "moderate" are not useful).

41

The case law concerning the form does not necessarily carry the day here because a possible treating source filled it out. Nonetheless, the decisions casting doubt on the form's efficacy bolster the ALJ's analysis. And in any case, Plaintiff's arguments fail to persuade. He seeks to distinguish the memory and understanding capacities in which Dr. Head found no limitations from the "ability to complete a normal workday" without unreasonable rest periods. (Doc. 12 at 6-7); (Tr. at 569.) If they are sufficiently different, then the inconsistencies the ALJ spotted dissipate. However, Plaintiff does not examine the whole form in his argument. The tensions discussed by the ALJ did not arise simply from the "Understanding and Memory" section. Instead the marked limitation in completing a normal workday came under the "Sustained Concentration and Persistence" section of the form. (Tr. at 569.) There were seven other capacities listed in that section; Dr. Head did not find evidence of limitation in any of these. (*Id.*) Thus, for example, there was no evidence of limitations in Plaintiff's "ability to maintain attention and concentration for extended periods," sustain ordinary routine work without supervision, work with others without distraction, or perform activities on a regular schedule and maintain punctual attendance. (*Id.*) At the same time, according to Dr. Head, Plaintiff could somehow not complete a normal workday. (*Id.*)

This raises enough of an inconsistency that Dr. Head should have explained his conclusions. Indeed, it is this type of scenario, with unexplained check-box findings contradicting each other, that lends support to the POMS treatment of the Section I portion as a mere worksheet which needs further elaboration in an actual RFC assessment. The ALJ properly perceived the tension in the findings, specifically noting Dr. Head's view of Plaintiff's largely normal concentration and persistence capacities. (Tr. at 22.)

Plaintiff's reply brief tries to avoid this conclusion by arguing that when Dr. Head said there was no evidence of a limitation he did not actually mean to say that there was no evidence of any limitation. (Doc. 14 at 3.) Instead, he seems to imply that the form's definition of "No Evidence" tacks on a qualifying clause to the rating, such that, "No Evidence" does not indicate the absence of any limitation; rather, "No Evidence" suggests that while there is no evidence *at the moment*, there might be later. As Plaintiff puts it, the fourteen "No Evidence" ratings simply represent "area[s] where the Doctor did not feel he had the clinical evidence to provide an opinion . . . ." (*Id.* at 4.) Conveniently for Plaintiff, the one area Dr. Head had clinical evidence was the strongly-worded limitation that Plaintiff would struggle to complete a normal workday without interruptions. (Tr. at 569.)

This novel gloss on "No Evidence" fails to persuade. First, Plaintiff does not explain how "clinical evidence" could exist concerning the "normal workday" limitation that he favors, but not any of the other seven abilities in the "Sustained Concentration and Persistence" category that go against him. For example, how could there be "clinical evidence" that Plaintiff's impairment would frequently interrupt him, but not any evidence of whether he could "maintain attention and concentration for extended periods." (*Id.*) While the answer might lie in complex and nuanced medical considerations, the question is apparent even to a layperson. Additionally, Plaintiff's interpretation mangles the form's text, requiring the Court to read phantom qualifications into the rating. The clear import of the "No Evidence" rating–that a limitation is not present–is subverted.

Further, courts appear to treat "No Evidence" ratings as indicating the plaintiff lacks a limitation. *See Rutter v. Comm'r of Soc. Sec.*, 91 F.3d 144, 1996 WL 397424, at *2-3 (6th Cir. 1996) (noting that evaluator's "No Evidence" findings were inconsistent with a low GAF score);

*Edwards v. Comm'r of Soc. Sec.*, 654 F. Supp. 2d 692, 698, 707 (W.D. Mich. 2009) (finding significant an evaluator's rating of "No Evidence"); *Booth v. Comm'r of Soc. Sec.*, No. 3:08CV332, 2009 WL 580312, at *7 (N.D. Ohio Mar. 5, 2009) (explaining *Rutter*); *Ackerman Papp v. Comm'r of Soc. Sec.*, No. 1:06-CV-832, 2008 WL 314684, at *3, 7 (W.D. Mich. Jan. 10, 2008) (finding that evaluator's "No Evidence" ratings supported ALJ's RFC). Moreover, Plaintiff's interpretation also undercuts the opinion's efficacy. If Dr. Head lacked evidence to opine on fourteen out of twenty areas, how cogent and supported could his opinion be on the rest? It seems that rather than adding to its forcefulness, such an interpretation would strip away much of its basis.

Next, Plaintiff's attempt to prop Dr. Head's opinion on more substantial objective support is unpersuasive. He contends that, contrary to the ALJ, Dr. Head made specific findings in his notes, citing a list of impairments. (Doc. 12 at 8.) As Defendant notes, however, the list Plaintiff cites was of his own subjective complaints to Dr. Head. (Doc. 13 at 17-18); (Tr. at 563, 567.) ALJs do not need to credit subjective complaints in treatment notes with the same weight as the medical opinions in those notes. *See Francis*, 414 F. App'x at 804; *Poe*, 342 F. App'x at 156; *Smith*, 482 F.3d at 877. In contrast, the ALJ could properly find that Dr. Head's actual observations would not support a finding of disability. As noted above, Dr. Head found Plaintiff had, among other things, good eye contact, happy interactions, calm behavior, logical thought processes, and intact judgment. (Tr. at 563, 567.)

Plaintiff's reply brief makes much of Defendant's assertion that Dr. Head's opinion was ungrounded because, among other things, he found no evidence of psychosis. (Doc. 14 at 3.) Yet, Dr. Head's notes on this point are, at best, ambiguous, and thus further bolster the ALJ's

conclusion that they lacked internal consistency and support. (Tr. at 21-22.) Dr. Head noted in both sessions, "no psychosis evident," yet also found paranoid delusions and diagnosed bipolar disorder with psychotic features. (Tr. at 563, 568.) From this, Plaintiff finds a "telling sign that [he] does in fact suffer from psychosis; it simply was not present during this one evaluation cited to by Defendant." (Doc. 14 at 3.) Dr. Head's diagnosis was not psychosis. Rather, he referenced a specific bipolar disorder in the DSM-IV that includes delusions or hallucinations commonly "consistent with depressive themes." DSM-IV, *supra* at 412. The DSM-IV includes various psychotic disorders, none of which Dr. Head diagnosed. *Id.* at 297-98. At the very least, then, Dr. Head's notes are ambiguous and do not support Plaintiff's assertion of full-blown psychosis.

Nor did the ALJ err by failing to include in the RFC a specific limitation regarding Plaintiff's interaction with supervisors. (Doc. 12 at 14.) Plaintiff again relies on Dr. Head's form, which reported Plaintiff was moderately limited in accepting instructions and responding appropriately to criticism from supervisors. (Tr. at 570.) This argument is even weaker than those above, because moderate limitations on the form only indicate the bare existence of an impairment, not the extent of the limitations it imposes. (Tr. at 569); *see also Land.*, 494 F. App'x at 49; *Smith*, 631 F.3d at 636-37; *Varga*, 2014 WL 1089740, at *4-5. Moreover, the term "moderate" does not provide useful information for formulating an RFC. *See* POMS DI 24510.065. Finally, the ALJ appropriately cited the reviewing physician's opinion that Plaintiff had no significant limitations in this area. (Tr. at 21, 76.)

Plaintiff's attack on the ALJ's physical limitations is also misguided. He seems to claim that the ALJ erred at step two by finding the arthritis non-severe. (Doc. 12 at 11.) To the extent he directly attacks step two, any error is harmless because once an ALJ finds any severe impairment,

she must subsequently consider all severe and non-severe impairments when constructing the RFC. *See Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). "The fact that some of [the plaintiff's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Id.*

In any case, substantial evidence supports the ALJ's analysis. His entire argument hinges on Dr. Shelby-Lane's tepid observation and equivocal opinion. Dr. Shelby-Lane noticed a slight limp and slow tandem, heel, and toe walking; she concluded that he "*may*" struggle with prolonged standing. (Tr. at 535 (emphasis added).) Plaintiff adds that the examiner found he experienced significant pain in most physical activities. (Doc. 14 at 4-5 (citing (Tr. at 549)).) However, Dr. Shelby-Lane may have written "pain" next to some of the activities, such as climbing stairs; the note is not entirely clear, but it certainly did not say "significant" pain. (Tr. at 539.) No other objective evidence concerning his arthritis is present. This slender record cannot bear the weight of Plaintiff's assertions. As the ALJ observed, Plaintiff never sought treatment for his hip or shoulder pain. (Tr. at 22.) And the record is bereft of any other evidence suggesting severe physical difficulties, the ALJ properly noted. (Tr. at 17, 37.) Indeed, he told the consultative mental examiner in January 2013 that he enjoyed fishing, biking, and walking, and the examiner noted he had normal gait. (Tr. at 543.) Likewise, he reported he could travel by walking. (Tr. at 225.) Moreover, he repeatedly denied physical problems, (Tr. at 278, 286, 289, 520), and other examinations did not flag any issues. (Tr. at 305, 310, 401, 437-39.) Thus, the ALJ adequately considered the scant evidence and developed a well-supported RFC.

### 3.      Conclusion

46

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D.

Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 29, 2015                    /S PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge